1  WALTER K. OETZELL (State Bar No. 109769)
   *woetzell@dgdk.com*
2  UZZI O. RAANAN (State Bar No. 162747)
   *uraanan@dgdk.com*
3  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   1900 Avenue of the Stars, 11th Floor
4  Los Angeles, California 90067-4402
   Telephone:   (310) 277-0077
5  Facsimile:   (310) 277-5735

6  Attorneys for John J. Menchaca, Trustee for the
   Chapter 7 Estate of TIFKAH, fka the House
7  Research Institute

8

9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                  **LOS ANGELES DIVISION**

13  In re                              Case No. 2:14-bk-21532-RK

14  TIFKAH, fka THE HOUSE RESEARCH      Chapter 7
    INSTITUTE
15
            Debtor.
16  _____    Adv. No. 2:16-ap-01201-RK

17  JOHN J. MENCHACA, TRUSTEE FOR THE
    CHAPTER 7 ESTATE OF TIFKAH,         **FIRST AMENDED COMPLAINT FOR**
18                                      **BREACH OF FIDUCIARY DUTY OF**
            Plaintiff,                  **LOYALTY; BREACH OF FIDUCIARY**
19                                      **DUTY OF CARE; AND CORPORATE**
        vs.                            **WASTE**
20
    WALLIS ANNENBERG, an individual;
21  LYNN BOOTH, an individual; JAMES D.
    BOSWELL , an individual; DERALD E.
22  BRACKMANN, an individual; TINA
    CARUSO, an individual; STEPHEN
23  CHANDLER, an individual; MALCOLM
    CUTLER, JR., an individual; DAVID Z.
24  D'ARGENIO, an individual; JOAN G. FLAX,
    an individual; TOMILEE TILLEY GILL, an
25  individual; STRAFFORD R. GRADY, an
    individual; ROBERT G. HAYMAN, an
26  individual; JOHN W. HOUSE, an individual;
    DAVID H. KOCH, an individual; WILLIAM
27  LUXFORD, an individual; CATHERINE
    MEYER, an individual; PATRICIA
28  MOLLER, an individual; LAURENCE G.

1364683.3                              1

1  PREBLE, an individual; CARMEN
   PULIAFITO, an individual; CHARLOTTE
2  SCHAMADAN, an individual; EDWARD P.
   ROSKI, an individual; FOREST G. SMITH
3  III, an individual; JOHN THOMAS, an
   individual; JAMES S. TWERDAHL, an
4  individual; WILLIAM B. WITTE, an
   individual; PETER WU, an individual; AND
5  DOES 1-25,

6              Defendants.

7

## JURISDICTION AND VENUE

8

9      1.      This adversary proceeding is a core proceeding pursuant to the provisions of 28

10  U.S.C. § 157(b)(2)(A) and (O), and this Court has jurisdiction over this adversary proceeding

11  pursuant to 28 U.S.C. §157, §1331, and § 1334.

12     2.      To the extent that the Court may determine that the claims for relief herein are not

13  core, as defined by 28 U.S.C. § 157, Plaintiff hereby consents to the entry of final orders or

    judgments by the Bankruptcy Court on all the claims herein.

14
15     3.      Venue in this judicial district is appropriate pursuant to the provisions of 28 U.S.C.

16  §1409(a).

17     4.      John J. Menchaca (the "Plaintiff") is the duly appointed and acting trustee for the

18  Chapter 7 bankruptcy estate (the "Estate") of House Research Institute ("HRI" or the "Debtor"), in

19  the bankruptcy case herein currently pending in the Bankruptcy Court for the Central District of

20  California as Case No. 2:14-bk-21532 and entitled *In re TIFKAH*, (the "TIFKAH Bankruptcy

21  Case").  Plaintiff brings this suit solely in his capacity as the Chapter 7 Trustee.

22     5.      The TIFKAH Bankruptcy Case was commenced by HRI filing a voluntary Chapter

23  7 petition on or about June 12, 2014  (the "Petition Date").

24

## PARTIES

25
26     6.      Plaintiff is the duly qualified and acting Chapter 7 Trustee herein and brings this suit

27  solely in his capacity as the Chapter 7 Trustee.

28

1364683.3                                    2

7. Plaintiff is informed and believes, and thereon alleges, that defendant Wallis Annenberg ("Annenberg") is an individual and at all times material herein was a resident of the County of Los Angeles, California.

8. Plaintiff is informed and believes, and thereon alleges, that defendant Lynn Booth ("Booth") is an individual and at all times material herein was a resident of the County of Los Angeles, California.

9. Plaintiff is informed and believes, and thereon alleges, that defendant James D. Boswell ("Boswell") is an individual and at all times material herein was a resident of the County of Los Angeles, California.

10. Plaintiff is informed and believes, and thereon alleges, that defendant Derald E. Brackmann ("Brackmann") is an individual and at all times material herein was a resident of the County of Los Angeles, California.

11. Plaintiff is informed and believes, and thereon alleges, that defendant Tina Caruso ("Caruso") is an individual and at all times material herein was a resident of the County of Los Angeles, California.

12. Plaintiff is informed and believes, and thereon alleges, that defendant Stephen Chandler ("Chandler") is an individual and at all times material herein was a resident of the County of Los Angeles, California.

13. Plaintiff is informed and believes, and thereon alleges, that defendant Malcolm Cutler, Jr. ("Cutler") is an individual and at all times material herein was a resident of the County of Los Angeles, California.

14. Plaintiff is informed and believes, and thereon alleges, that defendant David Z. D'Argenio ("D'Argenio") is an individual and at all times material herein was a resident of the County of Los Angeles, California.

15. Plaintiff is informed and believes, and thereon alleges, that defendant Joan G. Flax ("Flax") is an individual and at all times material herein was a resident of the County of Los Angeles, California.

1364683.3

3

1      16.    Plaintiff is informed and believes, and thereon alleges, that defendant Tomilee

2  Tilley Gill ("Gill") is an individual and at all times material herein was a resident of the County of

3  Los Angeles, California.

4      17.    Plaintiff is informed and believes, and thereon alleges, that defendant Strafford R.

5  Grady ("Grady") is an individual and at all times material herein was a resident of the County of

6  Los Angeles, California.

7      18.    Plaintiff is informed and believes, and thereon alleges, that defendant Robert G.

8  Hayman ("Hayman") is an individual and at all times material herein was a resident of the County

9  of Los Angeles, California.

10      19.    Plaintiff is informed and believes, and thereon alleges, that defendant John W.

11  House ("House") is an individual and at all times material herein was a resident of the County of

12  Los Angeles, California.

13      20.    Plaintiff is informed and believes, and thereon alleges, that defendant David H.

14  Koch ("Koch") is an individual and at all times material herein was a resident of the County of

15  New York, New York.

16      21.    Plaintiff is informed and believes, and thereon alleges, that defendant William

17  Luxford ("Luxford") is an individual and at all times material herein was a resident of the County

18  of Los Angeles, California.

19      22.    Plaintiff is informed and believes, and thereon alleges, that defendant Catherine

20  Meyer ("Meyer") is an individual and at all times material herein was a resident of the County of

21  Los Angeles, California.

22      23.    Plaintiff is informed and believes, and thereon alleges, that defendant Patricia

23  Moller ("Moller") is an individual and at all times material herein was a resident of the County of

24  Los Angeles, California.

25      24.    Plaintiff is informed and believes, and thereon alleges, that defendant Laurence G.

26  Preble ("Preble") is an individual and at all times material herein was a resident of the County of

27  Boulder, Colorado.

28

1       25.    Plaintiff is informed and believes, and thereon alleges, that defendant Carmen

2   Puliafito ("Puliafito") is an individual and at all times material herein was a resident of the County

3   of Los Angeles, California.

4       26.    Plaintiff is informed and believes, and thereon alleges, that defendant Charlotte

5   Schamadan ("Schamadan") is an individual and at all times material herein was a resident of the

6   County of Los Angeles, California.

7       27.    Plaintiff is informed and believes, and thereon alleges, that defendant Edward P.

8   Roski ("Roski") is an individual and at all times material herein was a resident of the County of

9   Los Angeles, California.

10       28.    Plaintiff is informed and believes, and thereon alleges, that defendant Forest G.

11   Smith III ("Smith") is an individual and at all times material herein was a resident of the County of

12   Orange, California.

13       29.    Plaintiff is informed and believes, and thereon alleges, that defendant John Thomas

14   ("Thomas") is an individual and at all times material herein was a resident of the County of Los

15   Angeles, California.

16       30.    Plaintiff is informed and believes, and thereon alleges, that defendant James S.

17   Twerdahl ("Twerdahl") is an individual and at all times material herein was a resident of the

18   County of Los Angeles, California.

19       31.    Plaintiff is informed and believes, and thereon alleges, that defendant William B.

20   Witte ("Witte") is an individual and at all times material herein was a resident of the County of Los

21   Angeles, California.

22       32.    Plaintiff is informed and believes, and thereon alleges, that defendant Peter Wu

23   ("Wu") is an individual and at all times material herein was a resident of the County of Los

24   Angeles, California.

25       33.    Plaintiff is informed and believes that the above named defendants , and each of

26   them ("Defendants"), at all times material herein were insiders of HRI.

27       34.    The true names and/or capacities, whether individual, corporate, associate or

28   otherwise that Plaintiff designated as Does 1 to 25 are unknown to Plaintiff, who therefore sues

1    said defendants by such fictitious names.  Plaintiff will seek leave to amend this Complaint when

2    the true names and/or capacities of said defendants have been ascertained.  Plaintiff is informed and

3    believes and thereon alleges that each of the defendants designated herein by such fictitious names

4    are responsible in some manner for the occurrences alleged in this Complaint, and are legally

5    obligated to Plaintiff for the reasons stated herein.

6          35.    At the times of the acts or omissions complained of herein, each of the Defendants

7    was a Trustee serving on the Board, as defined below.

8          36.    At the times of the acts or omissions complained of herein, Defendant Boswell was

9    also the Chief Executive Officer of HRI.

10          37.    Plaintiff is informed and believes, and thereon alleges, that Defendants, and each of

11    them, at all times material herein, were the agents, employees, servants, co-venturers and/or legal

12    representatives of each of the other Defendants, and that in doing the things herein alleged,

13    Defendants acted within the course and scope of said relationships and with the knowledge,

14    permission, consent, ratification and/or adoption of the other Defendants, and each of them.

15                                            **INTRODUCTION**

16          38.    HRI was established in 1946 by Dr. Howard House and incorporated under the

17    California Nonprofit Public Benefit Corporation Law.  Over the years it became and remained one

18    of the country's pre-eminent research facilities for hearing disorders.

19          39.    HRI is widely credited with helping to develop valuable methods of identifying and

20    treating hearing disorders, as well as inventing or improving hardware used to ameliorate hearing

21    loss.  Its contributions include, among others, helping to develop and pioneer use of the Cochlear

22    Hearing Implant, as well as countless mechanical improvements to the hearing aid device.  HRI is

23    also said to have provided training to over 22,000 medical doctors from all over the world with

24    regard to ear surgery technics.

25          40.    Having no shareholders, HRI was governed by a Board of Trustees, operating as a

26    board of directors, which was composed of the Defendants.  It was further subject to oversight by

27    the California Attorney General, which is tasked by law with overseeing California charitable

28    organizations.

1364683.3                                            6

41. As Trustees, Defendants were entrusted with oversight of this venerable institution, including by setting overall policy for implementation by HRI's officers. Defendants had a duty to inform themselves about HRI's operations, including whether its officers properly implemented the Board of Trustee's policies, and to take corrective action when policies were deemed improvident or improperly implemented.

42. As detailed below, Defendants, as Trustees or officers of HRI, breached their fiduciary duties during the times set forth herein by ignoring numerous red flags and significant issues concerning HRI's deteriorating financial condition, the accelerating loss of HRI's at one time significant assets, and issues with respect to the CNB Reimbursement Agreement for a letter of credit, including and culminating in an uninformed and critically flawed fire sale or virtual abandonment of all or substantially all of HRI's assets.

43. While failing to inform themselves about the fire sale of HRI's assets, or the options available to the Board other than this sale, the Defendants negotiated personal releases for themselves, but none of significant value to HRI. In fact, following the sale, HRI remained liable to the purchaser of its assets for $1,000,000. The sale, approved on a rushed two day notice and occurring only days before HRI filed for bankruptcy, resulted in limited benefit to HRI and its creditors. HRI received no proceeds from the sale of its assets, but Plaintiff is informed and believes the purchaser received over $25,000,000 in profit when it sold those assets less than two years after the Petition Date.

44. Although Defendants knew or should have known of the problems above, among others, and their duties, they failed to request, obtain, and consider all material information or conduct a reasonable investigation concerning these issues or to address them in any meaningful way. Instead, Defendants sat idly by while HRI suffered an existential liquidity crisis, lost millions of dollars in assets, and sank millions of dollars into debt.

45. Defendants also abdicated crucial decision making authority and failed to supervise Boswell, HRI's CEO, and to direct him and HRI's management to take steps necessary to improve the entity's precarious financial position, notwithstanding consultant admonitions that HRI was

1364683.3

7

1  within months of running out of cash, its infrastructure was too large, and that management was

2  slow to implement necessary changes and "complacent" or "paralyzed."

3          46.      These problems and Defendants' breaches continued until HRI was on the brink of

4  bankruptcy and Defendants approved the marketing and sale of HRI's real property to increase its

5  net assets.

6          47.      Defendants also abdicated crucial decision making authority to and failed to

7  supervise Boswell and Meyer, a Trustee, in respect of the marketing and proposed "sale" of HRI's

8  real property, resulting in a fire sale of HRI's assets far below fair market value.

9          48.      Defendants also failed to timely obtain and consider all material information or

10  conduct a reasonable investigation concerning the proposed sale and the value of the assets being

11  sold, although these aspects reasonably required such an investigation.  Had they satisfied their

12  duties, Defendants would or should have discovered that the scope of the sale, the assets being

13  sold, and the structure of the sale changed significantly from that initially contemplated to HRI's

14  and its unsecured creditors' detriment.

15          49.      In the two years before this sale of its assets, the real property rights alone (not

16  including valuable personal property) had been appraised three times and at amounts exceeding

17  $50,000,000.  The equity at these appraised values equaled or exceeded $20,000,000, and this did

18  not include the additional value of HRI's personal property which it had purchased at a cost of

19  millions of dollars.

20          50.      Had Defendants requested, obtained, and considered material information regarding

21  the sale, they would or should have discovered that that the value above could have been even

22  higher once the nature of the real property being sold changed to include the fee interest and

23  obviate certain restrictive lease covenants.

24          51.      Had Defendants requested, obtained, and considered all material information or

25  conducted a reasonable investigation regarding the sale, they would or should have discovered that

26  the change in the assets being sold also should have increased the number of potential bidders,

27  again raising the value.

28

1364683.3                                                8

52.     Rather than obtain and consider all material information or conduct a reasonable investigation of the matters above and HRI's ability to conduct an open public marketing process, including an orderly structured sale under the supervision of the bankruptcy court, the Board of Trustees abdicated crucial decision making authority to Boswell and Meyer concerning the sale and approved the sale of all or substantially all of HRI's assets in a rushed and uniformed manner in response to Boswell's request made only two days before the sale was scheduled to close.

53.     This transaction was hardly a sale at all, but instead, the virtual surrender of all or substantially all of HRI's assets, real and personal, a rushed fire sale in which HRI received no proceeds.  Instead, HRI was required to pay an additional amount equaling or approximating $100,000 on account of obligations to CNB and an additional amount to the Ground Lessor, while it remained liable to the purchaser, the Watt Party, all defined below, in the amount of $1,000,000.

54.     As part of this transaction, the Defendants negotiated and received personal releases for themselves from the Watt Party.  HRI, however, received no release from the Watt Party, except for amounts in excess $1,000,000, but it was required to give full releases to the Watt Party and CNB.

55.     A few days after this rushed transaction, HRI filed the Chapter 7 bankruptcy herein, without its most valuable assets, and with very little for the trustee to administer on behalf of HRI's unsecured creditors.

56.     Two years later, the Watt Party sold the real property it received from HRI for $50,000,000.

## GENERAL ALLEGATIONS

57.     At all times relevant herein, HRI was governed by a Board of Trustees (the "Board").

58.     Plaintiff is informed and believes, and thereon alleges, that at all times relevant herein, HRI funded its operations in two ways.  First, it obtained government grants through its researchers ("Research Grants").  When a researcher obtained a grant, the government also issued

1  another "indirect grant" allocation to HRI in the approximate amount of 80% of the grant, to defer

2  operational expenses connected with the grant, including the salary of the researcher.

3       59.    Plaintiff is informed and believes, and thereon alleges, that the second source of

4  HRI's funds was donations from individuals or other entities ("Development Funds").  These

5  donations were unrestricted, partially restricted, or restricted in their use.

6       60.    The departments responsible for Research Grants and Development Funds each had

7  a management structure headed by a vice president.

8       61.    Plaintiff is informed and believes, and thereon alleges, that in or around 1990, HRI's

9  main five story building (the "Main Building"), consisting of 115,369 square feet, was built for

10  approximately $32 million.

11       62.    HRI did not own the fee interest in the land upon which the Main Building and the

12  new wing, discussed below, sat (the "Property Fee"), but, instead, leased the land from St. Vincent

13  Medical Center ("St. Vincent" or the "Ground Lessor"), the fee owner, pursuant to that certain

14  Ground Lease dated December 31, 1986 (the "Ground Lease").  As discussed below, the Ground

15  Lease contained certain restrictive use covenants.

16       63.    Plaintiff is informed and believes, and thereon alleges, that in or around 2004, HRI

17  decided to build a new wing to the Main Building of approximately 25,000 square feet of mostly

18  lab space and conference rooms.

19       64.    HRI engaged Gates Capital to arrange for the issuance and sale of tax free bonds to

20  provide financing for construction of the new wing.

21       65.    On August 30, 2007, the California Statewide Communities Development Authority

22  issued $29,910,000.00 in Series 2007 Variable Rate Demand Bonds (the "2007 Bonds") for the

23  purpose of providing funds to make a loan to HRI to fund this construction, to redeem HRI's

24  existing bonds, to pay off two notes, and to pay bond costs, insurance costs, and fees in respect of

25  the letter of credit defined and discussed below.  The 2007 Bonds were scheduled to mature in

26  2037.  The 2007 Bonds and any remarketing, reoffering, or reissue of the same shall collectively be

27  referred to hereafter as the "Bonds" and the payments on the loan funding the Bonds shall be

28  referred to as the "Bond Payments."

1364683.3                                              10

66.     Payment of Bonds under various circumstances, including default, was secured by a letter of credit (the "Letter of Credit") issued by City National Bank ("CNB").

67.     In turn, HRI entered into a reimbursement agreement with CNB requiring HRI to repay CNB for such draws on the Letter of Credit (the "CNB Reimbursement Agreement").

68.     Plaintiff is informed and believes, and thereon alleges, there was never any draw on the Letter of Credit because of any Bond Payment default by HRI.

69.     The new wing, named the "Wallis Annenberg Research Center," was completed in 2008 and HRI partially moved in.  From time to time herein, the Wallis Annenberg Research Center together with the Main Building shall be referred to as the "Building" or the "Improvements," and, together with the Ground Lease, the "Real Property."

## HRI'S FINANCIAL PROBLEMS

70.     Beginning in 2008 and continuing thereafter, HRI had continuing financial difficulties, stemming in large measure from mismanagement of its operational expenses and overstaffing.

71.     Plaintiff is informed and believes, and thereon alleges, that, at this time and all times thereafter, HRI's administrative staff and management and executive structure, including staff and executive salaries, was far in excess of and considerably larger than what was required or reasonable, without limitation, for the size of HRI's research staff and Research Grant generation resources.

72.     Plaintiff is informed and believes, and thereon alleges, that HRI's financial pressures were exacerbated by certain management practices or policies, such as paying researchers' salaries from HRI's operational funds, notwithstanding the inclusion of salary components in, without limitation, the "indirect" aspects of Research Grants, not fully utilizing the Research Grants awarded to HRI's researchers, or not utilizing them at all, despite attendant fixed costs or shortage in HRI's operational funds.

73.     Plaintiff is informed and believes, and thereon alleges, that the gravity of these financial problems and the need for the Defendants to investigate and address them was indicated

by a number of sources distributed or available to the Defendants including, without limitation, the following.

74.    HRI's audited financial statements dated June 30, 2008 showed its expenses exceeded its revenue (shown on the financial statements as Public Support and Revenue) by an amount exceeding $6,900,000 after debt service and exceeding $5,500,000 prior to debt service. By contrast, HRI's financial statements the prior year showed HRI's revenue exceeded its expenses

75.    HRI's audited financial statements dated June 30, 2009 showed its expenses. exceeded its revenue in an amount exceeding $6,500,000.

76.    Plaintiff is informed and believes, and thereon alleges, that as of April, 2010, HRI was projecting a $2,000,000 deficit in revenue over operational costs.

77.    Plaintiff is informed and believes, and thereon alleges, that by the end of May, 2010, HRI's deficit in revenue over operational costs had increased to $3,000,000.

78.    HRI's audited financial statements dated June 30, 2010 showed the amount by which its expenses exceeded its revenue had grown to $9,000,000, over $1,000,000 greater than the prior year.

79.    HRI's audited financial statements dated June 30, 2010 included a going concern provision (an auditor's opinion or footnote warning there is substantial doubt about the organization's ability to continue as a going concern or to function for the foreseeable future) stating that HRI had suffered recurring deficits, noting that it had been unable to meet debt covenants under the CNB Reimbursement Agreement, and warning that HRI's ability to continue as a going concern was dependent, inter alia, on implementation of a plan to reduce expenses, to correct deficiencies, and to meet debt requirements.

80.    Plaintiff is informed and believes, and thereon alleges, that notwithstanding the above, HRI failed to reduce its expenses, and its audited financial statements show expenses exceeding $24,000,000 for both 2010 and 2011.

81.    Plaintiff is informed and believes, and thereon alleges, that on March 3, 2011, HRI's Chief Financial Officer reported that HRI was "upside down in its accounts by $21,000,000."

1364683.3

82.    HRI's audited financial statements dated June 30, 2011, included a provision stating that HRI had suffered significant decreases in net assets, noting that it had been unable to meet covenants in the CNB Reimbursement Agreement, and warning that HRI's ability to continue as a going concern was dependent, inter alia, on implementation of plans to reduce expenses in order to increase net assets.

83.    Plaintiff is informed and believes, and thereon alleges, that notwithstanding the above HRI failed to significantly reduce its expenses and its audited financial statements show expenses of approximately $24,000,000 for 2011 and $23,000,000 for 2012.

84.    Plaintiff is informed and believes, and thereon alleges, that as of March 8, 2012, HRI had projected as much as a $4,000,000 deficit in revenue over operational costs for Fiscal Year 2011.

85.    On or about April 12, 2012, HRI's Chief Financial Officer announced that HRI was $2,400,000 short on meeting its budget and that after dipping into cash reserves and releasing endowment monies (which Plaintiff is informed and believes some or all of which were restricted and not available to pay for HRI's operations) several times over the past few years, HRI "now lives and dies on contributions."

86.    HRI's audited financial statements dated June 30, 2012 showed its expenses exceeded its revenue by an amount exceeding $9,400,000, more than $5,000,000 higher than the prior year.

87.    HRI's audited financial statements dated June 30, 2012 included a going concern provision stating that HRI had suffered significant decreases in net assets, noting that it had been unable to meet covenants in the CNB Reimbursement Agreement and warning that HRI's ability to continue as a going concern depended, inter alia, on implementation of plans to reduce expense in order to increase net assets.

88.    Plaintiff is informed and believes, and thereon alleges, that HRI did not put together audited financial statements for its fiscal year 2013 because of its ongoing financial crises.

89.    Plaintiff is informed and believes, and thereon alleges, that notwithstanding the existential threat HRI's precarious financial position posed, Defendants failed to devote sufficient

1    attention to HRI's financial problems as shown by the failure to attend board meetings such that

2    quorums were difficult to obtain and action difficult to take.  Numerous Board meetings and

3    meetings of the Board's Executive/ Finance Committee had insufficient attendance to constitute a

4    quorum, including, without limitation, the following:

5              A.    The April 15, 2010 Board's Executive/ Finance Committee Meeting;

6              B.    The April 28, 2011 Board Meeting.  Plaintiff is informed and believes, and

7    thereon alleges, that the Trustees who failed to attend this meeting included, without limitation,

8    Annenberg, Brackmann, Caruso, Gill, Grady, Koch, Moller, Preble, Puliafito, Roski, Witte, and

9    Wu;

10             C.    The January 26, 2012 Board Meeting.  Plaintiff is informed and believes,

11   and thereon alleges, that the Trustees who failed to attend this meeting included, without limitation,

12   Annenberg, Brackmann, Caruso, Gill, Grady, Koch, Moller, Puliafito, Roski, Witte, and Wu;

13             D.    The July 26, 2012  Board Meeting.  Plaintiff is informed and believes, and

14   thereon alleges, that the Trustees who failed to attend this meeting included, without limitation,

15   Annenberg, Caruso, Flax, Gill, Grady, Hayman, House, Koch, Puliafito, Roski, and Witte; and

16             E.    The January 24, 2013 Board Meeting.  Plaintiff is informed and believes,

17   and thereon alleges, that the Trustees who failed to attend this meeting included, Annenberg,

18   Brackmann, Caruso, Flax, Grady, Hayman, House, Koch, Moller, Puliafito, Roski, and Witte.

19             F.    In fact, at the October 27, 2011, Board Meeting, Boswell reported that it had

20   been very difficult to get a quorum at Board meetings over the past two to three years.

21             G.    On June 2, 2011, the Executive & Finance Committee discussed the ongoing

22   failure to obtain a quorum at Board Meetings.

23       90.    Plaintiff is informed and believes, and thereon alleges, that Defendants ignored or

24   were slow to respond to HRI's mounting financial difficulties and what responses were employed

25   were untimely, insufficient, or both.

26       91.    Plaintiff is informed and believes, and thereon alleges, that Defendants failed to

27   inform themselves about or properly oversee HRI's collection of various significant pledges and

28   promised contributions, thereby aggravating the financial pressures HRI was experiencing.

92.     Plaintiff is informed and believes, and thereon alleges that, by April 2012, Andrea Belz, a financial consultant hired by HRI, warned Defendants, inter alia:

    A.     HRI would run out of cash in July 2012;

    B.     Its fundraising was unlikely to grow;

    C.     Its current model of operations was unsustainable;

    D.     Its organization was "top heavy;"

    E.     Its infrastructure was too big for the size of research being performed;

    F.     Its management has traditionally been slow to implement change creating a self-fulfilling prophecy;

    G.     Descriptions of management include "complacent" and "paralyzed;"

    H.     HRI's senior and executive management structure was unwieldy and slowed down or prevented decision making altogether; and

    I.     Significant changes were required including, without limitation,

        i)     staff layoffs;

        ii)    development of a culture of action;

        iii)   significant management reduction;

        iv)    reduction in the work week; and

        v)     various consultant reduction.

93.     Plaintiff is informed and believes, and thereon alleges that, notwithstanding the dire financial condition reflected in the financial statements and the urgent and catastrophic warnings provided by Belz, Defendants failed to meaningfully consider and implement the changes outlined by Belz or to take significant action to save HRI.

94.     Plaintiff is informed and believes, and thereon alleges, that by June 2012, Kibel Green, a restructuring management consultant, proposed a plan to Defendants which identified and addressed certain key issues including, without limitation:

    A.     HRI's chronic cash flow problems and the continual losses resulting from HRI's expenses exceeding its public support and revenue;

    B.     The CNB covenants and HRI's failure to satisfy them;

1364683.3
15

        C.     HRI's borrowing against restricted funds; and

        D.     The sale of the Building.

95.    In particular, Kibel Green informed Defendants, inter alia, of the following:

        A.     HRI was projected to run out of cash by August 2012;

        B.     The then-current budget included a shortfall of $1,300,000; and

        C.     HRI had borrowed in excess of $18,000,000 from restricted funds and was required to repay those funds.

96.    Plaintiff is informed and believes, and thereon alleges, that the Kibel Green plan proposed the sale of the Building, the value of which had been appraised by Monroe Appraisal Services at $55,000,000 less than two years before.

97.    Plaintiff is informed and believes, and thereon alleges, that Defendants unreasonably wasted valuable time implementing the sale of the Building.  Rather than pursuing the plan to sell the Building as proposed, they failed to actively pursue such a sale for a period exceeding another year, at which point HRI was on the brink of bankruptcy.

98.    Plaintiff is informed and believes, and thereon alleges, that Defendants failed to meaningfully inform themselves about, consider, and implement the changes outlined by Kibel Green.

99.    Plaintiff is informed and believes, and thereon alleges, that although HRI never defaulted in making the required Bond Payments, it repeatedly failed to comply with certain covenants in the CNB Reimbursement Agreement, particularly the liquidity and net asset covenants.

100.    Plaintiff is informed and believes, and thereon alleges, that CNB waived these defaults from time to time, but this failure to comply remained an issue that Defendants failed to appreciate and satisfactorily resolve.

101.    Plaintiff is informed and believes, and thereon alleges, that on or about June 30, 2010 and thereafter, HRI failed to satisfy the liquidity covenant in the CNB Reimbursement Agreement, indicating, along with other records and facts above, that it was facing a liquidity crisis.

102.   Plaintiff is informed and believes, and thereon alleges, that, by October 4, 2013, CNB notified HRI by letter of even date that it would no longer waive any existing defaults in the CNB Letter of Credit Reimbursement Agreement.

103.   Plaintiff is informed and believes, and thereon alleges, that, by January 4, 2014, CNB notified HRI by letter to Boswell of even date that:

A.   HRI was in default of various covenants in respect of the CNB Letter of Credit Reimbursement Agreement;

B.   HRI had sold equipment and machinery subject to CNB's security interest and received proceeds therefrom in an amount exceeding $700,000;

C.   CNB had previously demanded sequestration of the proceeds from the sale of the equipment and machinery, and HRI failed to comply; and

D.   CNB demanded immediate turnover of the proceeds from the sale of the equipment and machinery

104.   Plaintiff is informed and believes, and thereon alleges, that, by March 14, 2014, CNB notified HRI by letter to the Board of even date that:

A.   HRI was in default of various covenants in respect of the CNB Letter of Credit Reimbursement Agreement;

B.   HRI has failed to comply with prior demands to cure the defaults;

C.   HRI has failed to comply with prior demands to turn over proceeds of the sale of the equipment and machinery above;

D.   Boswell has expressed his intention to expend CNB's collateral and proceeds thereof in violation of CNB's property rights;

E.   HRI was operating "in the vicinity of insolvency" and, therefore, "now owes a fiduciary duty to CNB and creditors;" and

F.   CNB requested turnover of the above proceeds.

105.   Plaintiff is informed and believes, and thereon alleges, that by June 2012, in excess of $15 million in permanently restricted endowment funds had been "borrowed" by HRI or appropriated and spent for operational expenses.

106.    Plaintiff is informed and believes, and thereon alleges, that certain restricted donations or endowments were appropriated and spent for purposes other than the purposes for which they were designated and restricted, without notice to or permission from the donors that established such restricted donations or endowments.

107.    These endowments include, without limitation, that certain William Randolph Hearst Endowed Fund for Education established in 1995 and contributions made thereto.

108.    Plaintiff is informed and believes, and thereon alleges, that said fund was restricted in use and HRI was prohibited from paying its administrative expenses therefrom.

109.    Plaintiff is informed and believes, and thereon alleges, that HRI withdrew all or substantially all of said funds for payment of its administrative expenses and depleted it in 2012 and 2013.

110.    Plaintiff is informed and believes, and thereon alleges, that by the end of 2012, various donors had discontinued funding HRI for various reasons, including, without limitation, HRI's use of donations for purposes other than those for which they were designated and restricted.

111.    In 2013, HRI's financial problems and liquidity crisis worsened.

112.    Plaintiff is informed and believes, and thereon alleges, that, beginning October 4, 2013, CNB notified HRI by letter of even date that it would no longer waive any existing defaults in the CNB Letter of Credit Reimbursement Agreement and by subsequent communications, including, without limitation those letters discussed above notified HRI of its defaults and requested various information and actions.

113.    Plaintiff is informed and believes, and thereon alleges, that Defendants ignored the matters above, including, without limitation, HRI's continued losses, the going concern provisions in HRI's audited financials, its operational costs continually exceeding its revenue, its liabilities exceeding its unrestricted net assets, and its failure to observe and its defaults in respect of the various covenants in the CNB Reimbursement Agreement, and its misuse of restricted endowment funds either intentionally or with deliberate indifference.

114.    Each of the above occurrences was a red flag or an indication of HRI's poor financial condition and management, reflecting a need for Defendants to engage HRI in actions designed to address these existential problems and to increase its net assets.

115.    Plaintiff is informed and believes, and thereon alleges, that midway through 2013, the decision was made that HRI would try to form an association with a larger research institution, preferably UCLA or USC. However, instead of forming such an association, which would have benefitted HRI and its operations, Defendants allowed USC and UCLA to hire away the vast majority of HRI's researchers.

## THE BOARD'S ABDICATION OF CRUCIAL AUTHORITY AND THE

## FLAWED SALE PROCESS

116.    As set forth above, HRI's expenses consistently exceeded its revenue.

117.    As set forth above, HRI's audited financial statements expressed the need for HRI to reduce expenses and increase net assets.

118.    As set forth above, consultants expressed that HRI was "top heavy" and its executive staff was too large for the size of its research operations.

119.    Notwithstanding the above, Defendants abdicated crucial decision making authority to Boswell and failed to direct him and HRI's other officers to take steps necessary to improve HRI's precarious financial position, despite consultant admonitions that HRI was within months of running out of cash, its infrastructure was too large, and that management was slow to implement necessary changes, "complacent," or "paralyzed."

120.    Plaintiff is informed and believes, and thereon alleges, that on or about April 26, 2013, approximately a year after Kibel Green's recommendation to sell the Building, the Board finally authorized HRI to sell the Real Property. At this point, HRI was on the brink of bankruptcy.

121.    Plaintiff is informed and believes, and thereon alleges, that in or about July 2013, HRI engaged CBRE as its agent to market, lease portions of, and outright sell its Real Property.

122.    Plaintiff is informed and believes, and thereon alleges, that Boswell represented HRI in the leasing, marketing, and sale of its Real Property and in respect of the bankruptcy case below.

123.    Plaintiff is informed and believes, and thereon alleges, that Defendant Meyer also represented HRI in the leasing, marketing, and sale of its Real Property and in respect of the bankruptcy case below, either independently or by assisting Boswell.

124.    Plaintiff is informed and believes, and thereon alleges, that, in breach of their fiduciary duties, the Trustees, and each of them, abdicated crucial decision making authority to Boswell and Meyer, and each of them.

125.    Plaintiff is informed and believes, and thereon alleges, that, in breach of their fiduciary duties, the Defendants failed to supervise Boswell, Meyer, CBRE, and each of them.

126.    Plaintiff is informed and believes, and thereon alleges that, less than a year prior to said authorization, the Real Property was appraised as having a fair market value in excess of $52,000,000.

127.    Plaintiff is informed and believes, and thereon alleges, that on or around October 10, 2010, HRI received an appraisal on its Real Property of $55,000,000 from Monroe Appraisal Services.

128.    Plaintiff is informed and believes, and thereon alleges, that on or around July 25, 2013, HRI's Real Property was appraised by RRSMBC at $52,015,000.

129.    Plaintiff is informed and believes, and thereon alleges, that on or around August 22, 2013, HRI received a CBRE Broker's Opinion of $42,000,000 as the fair market value of HRI's Real Property.

130.    Plaintiff is informed and believes, and thereon alleges, that instead of commencing an open and competitive sale process in respect of HRI's Real Property, reasonably calculated to produce a price at least equal to its market value, Boswell, Meyer, and CBRE engaged HRI in a flawed sale process.

131.    Plaintiff is informed and believes, and thereon alleges, that said flawed sale process initially consisted of a limited notice of the sale to a small and select group of potential purchasers or investors (the "Initial Sale Plan"), rather than an open and public sale that would have exposed the Real Property to a broader group of potential purchasers.

1    132.    By March 7, 2014, the Board authorized Boswell to file and act on HRI's behalf in a

2  Chapter 7 bankruptcy case.

3    133.    Plaintiff is informed and believes, and thereon alleges, that, under a bankruptcy

4  filing, HRI's Real Property would have been sold under bankruptcy court supervision in an open

5  and public sale subject to overbids.

6    134.    Plaintiff is informed and believes, and thereon alleges, that, notwithstanding the

7  appraisals above, the significant equity in HRI's Real Property, and the Board's authorization to

8  file bankruptcy, Boswell and Meyer determined to sell HRI's Real Property without an open and

9  structured public marketing process and outside the supervision of the Bankruptcy Court.

10    135.    In an email, Meyer described "the plan," as, inter alia, to obtain releases for the

11  Trustees and officers from CNB and St. Vincent, to sell HRI's real property in a "short sale," and

12  then file a Chapter 7 bankruptcy case, stating "[a]t that point, the Chapter 7 trustee will have little

13  to liquidate."

14    136.    Plaintiff is informed and believes, and thereon alleges, that, around or after the

15  Initial Sale Plan and authorization to file bankruptcy, Boswell and Meyer, and each of them, seized

16  on an incomplete sale proposal floated (the "Watt Proposal") by Watt Investment Partners ("Watt")

17  which proposal subsequently and significantly changed in form, scope, and the assets being

18  acquired.

19    137.    Plaintiff is informed and believes, and thereon alleges, that this change of the Watt

20  Proposal in form, scope, and assets included, inter alia, the sale by the Ground Lessor of the

21  Property Fee, along with HRI's Building, rather than simply HRI's sale of the Real Property

22  (HRI's Building and its interest in the Ground Lease), and that this inclusion of the Property Fee in

23  the transaction significantly increased the market value and desirability of the HRI's Real Property.

24    138.    Plaintiff is informed and believes, and thereon alleges, that prior to this change of

25  the Watt Proposal in form, scope, and assets, Defendants had been informed, inter alia, by CBRE

26  that the terms of the restrictive use provisions in the Ground Lease reduced amounts that

27  prospective purchasers were willing to offer for the Real Property in the Initial Sale Plan.

28

1364683.3                                    21

139.    Plaintiff is informed and believes, and thereon alleges, that this change in form and scope of the sale and in the nature of the assets being acquired under the Watt Proposal significantly increased the value of the Property and the number of prospective purchasers, because, inter alia, potential purchasers would now be receive, in addition to the Building, the Property Fee, rather than simply the Ground Lease with its restrictive provisions, which provisions had previously reduced the value of the Real Property.

140.    Plaintiff is informed and believes, and thereon alleges, that this change of the Watt Proposal in form, scope, and assets also included, inter alia, the sale by HRI of all, or substantially all, of its assets, including the Real Property and significant and valuable personal property (collectively, the "Property").

141.    The change in form and scope of the sale and in the nature of the assets being acquired under the Watt Proposal significantly increased the value of the Property and the number of prospective purchasers, because, inter alia, potential purchasers would be receiving, in addition to the subject real property, all or substantially all of HRI's personal property.

142.    As discussed below, however, despite the apparent increase in the value of HRI's Property, the apparent increase in the number of potential purchasers, and the inclusion of HRI's personal property occasioned by the nature of the assets being acquired in the sale, the Watt Proposal changed in form such the value allocated to HRI's Property was substantially less than its market value and that HRI would be surrendering all or substantially all of its assets and receiving no proceeds therefor.

143.    Defendants were aware that they had received three appraisals or opinions of value on the Property, two of which less than a year before, and each well in excess of the value allocated to it in the Watt Proposal, although each of those prior appraisals valued the Ground Lease with its restrictive covenants, rather than the Property Fee.

144.    Plaintiff is informed and believes, and thereon alleges that on or about April 2, 2014, Don Graham, HRI's former Vice President of Development, who had been directly involved in the Initial Sales Plan and efforts thereunder, sent a letter by email to Defendants including

1    Boswell as CEO, Meyer as Board Chair, House, as President, and each of them (the "Graham

2    Letter"), stating and explaining, inter alia:

3              A.    The proposed sale to Watt was "significantly below appraised and market

4    rate (essentially a 'short sale')."

5              B.    Potential purchasers are not aware that HRI is now "selling its real estate at a

6    price so far below market rates."

7              C.    The primary reason various potential purchasers lost interest in the Initial

8    Sale was because of the restrictive conditions in the Ground Lease.

9              D.    The elimination of the Ground Lease "should open up renewed interest with

10    potential purchasers."

11              E.    Other potential investors should be contacted and notified of the new terms

12    of the proposed sale.

13              F.    Since the Property Fee was now part of the package and the restrictive

14    covenants in the Ground Lease were no longer an issue, the price of the assets sold and number of

15    potential purchasers would significantly increase.

16              G.    The elimination of the Ground Lease and the restrictive covenants should

17    increase the number of lessees and increase the value of those leases.

18              H.    Since the inclusion of the Property Fee is a "new development," he doubted

19    that CBRE had factored it in to its Initial Sale Plan efforts.

20              I.    It should not be necessary to sell HRI's Real Property for such a low

21    amount; HRI could wait, "under the protection of bankruptcy" for a more attractive offer and a

22    price more consistent with the value of the assets now being sold.

23              145.    Plaintiff is informed and believes, and thereon alleges that, notwithstanding the

24    appraisals above and the observations and statements contained in the Graham Letter, Defendants

25    failed to meaningfully and reasonably consider the matters above or implicated thereby or

26    investigate the same, nor did they take or cause Boswell, Meyer, management, or CBRE to take

27    any additional steps to contact potential purchasers or effectively market the Property in view of

28

1  the change in form and scope of the sale and in the assets being sold, including a sale after filing

2  under the supervision of the bankruptcy court.

3      146.    Plaintiff is informed and believes, and thereon alleges that, notwithstanding

4  observations and statements contained therein, Boswell and other Defendants summarily dismissed

5  the Graham Letter and continued on working exclusively with the Watt Proposal without obtaining

6  or considering the required information or taking any additional steps to contact potential

7  purchasers or effectively market the Property in view of the change in form and scope of the sale

8  and in the assets being sold, including a sale after filing under the supervision of the bankruptcy

9  court.

10      147.    Prior to or as of this point and thereafter, Defendants knew or should have known

11  that this change in form and scope of the sale and in the nature of the assets being sold in the Watt

12  Proposal would have a significant effect increasing the number of potential buyers and the value of

13  the assets now being sold, along with the proceeds to be received by HRI, had Defendants properly

14  marketed the Property, including publically advertising it, or, at the very least, informed potential

15  purchasers, who had previously expressed interest, of the changes.

16      148.    Plaintiff is informed and believes, and thereon alleges, that the change in form,

17  scope, and assets in the Watt Proposal also included, inter alia, a change in the structure of the

18  transaction such that HRI would receive no proceeds for the surrender of all its assets,

19  notwithstanding the prior and current appraisals in excess of $50,000,000 for HRI's Real Property

20  alone.  Instead, HRI would now pay approximately $100,000 on account of an obligation to CNB

21  and an additional amount to the Ground Lessor. HRI would also incur liability to Watt of not less

22  than $1,000,000.  HRI would also release CNB and Watt from all liabilities, but receive no release

23  from either entity, except a limited release from Watt of little value.  The Trustees and officers,

24  however, negotiated complete personal releases for themselves.

25      149.    The matters above, and each of them, including, without limitation, the increased

26  value of the Property, the increased number of potential purchasers or bidders, HRI's surrender of

27  all or substantially all of its assets, HRI's failure to receive any proceeds notwithstanding the prior

28  and current appraisals of HRI's Real Property alone, and the requirement that HRI pay others for

1364683.3                                        24

the surrender of all or substantially all of its Property, reasonably called for an investigation by the Defendants of the Watt Proposal, the value of the Property, and what other potential purchasers would be willing to pay for the same property outside of bankruptcy or in such bankruptcy which the Board already authorized.

150.    Plaintiff is informed and believes, and thereon alleges, that, if an investigation had been pursued, it would have disclosed, inter alia, that the Property to be sold or surrendered was considerably more valuable, as much as twice, than the amount ascribed to it in the Watt Proposal and HRI should have received proceeds well in excess of those received in the Watt Transaction, defined below.

151.    Defendants' fiduciary duties of good faith, loyalty, and care required them to obtain and consider all material information concerning the Watt Proposal and the Watt Transaction and to take the steps necessary to effectively market and obtain the best price for HRI's property and to insure that HRI received proceeds of the sale, both prior to and in respect of the change in form and scope of the sale and in the assets being sold, including a sale after filing under the supervision of the bankruptcy court.

152.    These duties included, without limitation, the following:

A.    Being properly informed about and considering the increase in value of the Property and in funds to be paid to HRI now that the sale included the Property Fee rather than simply the Ground Lease and testing the market to insure that HRI received fair market value.

B.    Being properly informed about and considering the increased number potential purchasers of the Property now that the sale included the Property Fee rather than simply the Ground Lease and testing the market in respect of the same.

C.    Being properly informed about and considering the interest of those potential purchasers whom CBRE had contacted in the process of the Initial Sale Plan now that the sale included the Property Fee rather than simply the Ground Lease and testing the market in respect of the same. These potential purchasers contacted in the process of the Initial Sale Plan included, without limitation, Archway Holdings, Healthwest Realty, Pacific Medical Buildings, and Strategic Medical Partners, and others.

D.    Being properly informed about and considering the increased value of the Property and funds to be paid to HRI if the sale was conducted under the supervision of the bankruptcy court.

E.    Being properly informed about and considering the amount being received under the Watt Proposal and Watt Transaction when three appraisals or opinions of value, two of which were received less than a year before the Watt Proposal and Watt Transaction, valued the Property at considerably more for the Ground Lease including its restrictive covenants, rather than the Property Fee the inclusion of which removed those restrictive covenants.

F.    Being properly informed about and considering the amount being received under the Watt Proposal and Watt Transaction when the transaction included HRI's surrender of all or substantially all its Property.

153.    Plaintiff is informed and believes, and thereon alleges that, notwithstanding their duties and the Graham Letter, Defendants failed to obtain and consider all material information concerning  the Watt Proposal  and the change in form and scope of the sale and in the assets being sold.

154.    Plaintiff is informed and believes, and thereon alleges that, notwithstanding their duties and the Graham Letter, Defendants failed to obtain and consider all material information concerning  the Watt Proposal and the increased value of the Property now being sold and the ability to obtain a higher price and funds therefor now that the sale included the Property Fee.

155.    Plaintiff is informed and believes, and thereon alleges that, notwithstanding their duties and the Graham Letter, Defendants failed to obtain and consider all material information concerning  the Watt Proposal and the increased number of potential purchasers now that the sale included the Property Fee.

156.    Plaintiff is informed and believes, and thereon alleges that, notwithstanding their duties and the Graham Letter, Defendants failed to obtain and consider all material information concerning  the Watt Proposal  now that the sale included all or substantially all of HRI's assets.

157.    Plaintiff is informed and believes, and thereon alleges that, notwithstanding their duties and the Graham Letter, Defendants failed to obtain and consider all material information

1    concerning the Watt Proposal when its Real Property alone had been recently and continually

2    valued at more than double the amount ascribed to it in the Watt Proposal and Watt Transaction

3    described below.

4        158.    Plaintiff is informed and believes, and thereon alleges that Defendants failed to

5    obtain and consider all material information concerning whether the sale should have been

6    conducted under the supervision of the Bankruptcy Court, notwithstanding that on March 7, 2014,

7    the Board had authorized the filing of a Chapter 7 Bankruptcy.

8        159.    Instead, Plaintiff is informed and believes, and thereon alleges that Defendants made

9    no further significant inquiry and took insufficient actions to inform themselves of the matters

10   above, but instead abdicated their decision making power to Boswell, Meyer, and each of them, in

11   respect of the Watt Proposal and Watt Transaction.

12

13                          **THE RUSHED FIRE SALE**

14       160.    Defendants' failure to meaningfully address the red flags and financial issues facing

15   HRI, their failure to meaningfully address and resolve the issues arising with respect to the CNB

16   Reimbursement Agreement, their abdication of decision making power to Boswell, Meyer, and

17   each of them, their failure to supervise Boswell, Meyer, and each of them, their failure to obtain

18   and consider all material information in respect of the sale of the Property, and their failure to

19   consider and make the necessary changes in respect of the marketing of the Property culminated in

20   an uninformed, rushed, and hurried sale or surrender of all or substantially all of HRI's assets, real

21   and personal, for a grossly low amount in a transaction where the Plaintiff is informed and believes

22   HRI received no proceeds, but instead, was required to pay an additional amount equaling or

23   approximating $100,000 on account of obligations to CNB and an additional amount to the Ground

24   Lessor, and it remained liable to the Watt Party, defined below, in the amount of $1,000,000 on an

25   obligation secured by the assets remaining.

26       161.    Plaintiff is informed and believes, and thereon alleges, that the final terms of this

27   transaction (the "Watt Transaction") were substantially that (a) Watt or an entity named RP WIP

28   LA Med Office Lender, LLC (individually or collectively, as applicable, the "Watt Party")

1364683.3                                27

purchased CNB's rights as against HRI under, inter alia, the CNB Reimbursement Agreement for $21,500,000; (b) the Watt Party received all, or substantially all, of HRI's assets, including its valuable personal property and the Real Property, for the claims it had obtained against HRI in respect of the CNB Reimbursement Agreement; (c) HRI remained liable to the Watt Party in an amount of $1,000,000 on an obligation secured on any remaining assets; (d) HRI received no funds, but instead paid an additional sum equaling or approximating $100,000 in respect of the CNB Reimbursement Agreement; (e) HRI paid an additional amount at closing of $251,063.00; and (f) the Watt Party purchased the fee interest in the land from the Ground Lessor for an amount, on information and belief, of approximately $3,000,000.

162.    Plaintiff is informed and believes, and thereon alleges that, as part of the Watt Transaction, HRI was to surrender all or substantially all of its assets to the Watt Party.

163.    This Property included HRI's Real Property, appraised or valued, not a year earlier, at between $42,000,000 and $52,000,000, values which were $12,000,000 and $20,000,000 in excess of the amounts borrowed in respect of the Bonds.

164.    This Property included HRI's personal property, in an amount to be proven, but which Plaintiff is informed and believes exceeds $2,000,000.

165.    Plaintiff is informed and believes, and thereon alleges that, as part of the Watt Transaction, the Defendants negotiated and received personal releases from the Watt Party.

166.    Plaintiff is informed and believes, and thereon alleges that, as part of the Watt Transaction, HRI was to receive no release from the Watt Party except for amounts in excess $1,000,000, but it was required to give and gave a full release to the Watt Party.

167.    Plaintiff is informed and believes, and thereon alleges that, as part of the Watt Transaction, HRI was to receive no release from CNB, but it was required to give and gave a full release to CNB.

168.    On June 4, 2014, Boswell sent the Trustees, and each of them, an email requesting them to approve the Watt Transaction, describing certain terms, and attaching an incomplete copy of the "near final version" of the purchase and sale agreement and a resolution approving the sale.

169. Boswell requested "immediate response by email" to him because "[closing] is set for June 6," two days later.

170. Plaintiff is informed and believes, and thereon alleges that Defendants did not meet or otherwise engage in discussion or investigation of the merits of the Watt Transaction, the value of the Property being surrendered thereunder, and whether HRI should receive proceeds from the sale proposed in view of the value of the Property being surrendered.

171. Plaintiff is informed and believes, and thereon alleges, that the following Trustees (the "Approving Trustees") voted to approve the Watt Transaction without further discussion, inquiry, or investigation of the merits of the Watt Transaction:

1. Booth,
2. Brackmann
3. Caruso
4. Chandler
5. Cutler
6. D'Argenio
7. Flax
8. Gill
9. Hayman
10. Koch
11. Luxford
12 Meyer
13. Moller
14. Preble
15. Puliafito
16. Schamadan
17. Smith
18. Thomas
19. Twerdahl

1364683.3
29

20.    Wu

172.    After consummation of the transaction above, HRI filed the TIFKAH Bankruptcy Case on the Petition Date.

173.    Plaintiff is informed and believes, and thereon alleges, that, less than two years after the closing of the Watt Transaction, the Watt Party sold the building received in the Watt Transaction for an amount in excess of $50,000,000 in a sale its agent reported as "the widely-marketed offering, which garnered very strong interest from a broad range of prospective buyers."

174.    Plaintiff is informed and believes, and thereon alleges, that on or about November 1, 2013, Boswell, Meyer, and each of them, were notified by email from Defendant Preble of HRI's legal duty to notify the California Attorney General, which oversees California non-profits and charities, prior to the sale of all or substantially all of its assets.   Despite the Defendants' knowledge that under California law a sale of all or substantially all of a non-profit's assets requires notice to the California Attorney General, which has the authority to review and object to such a sale, this notice was not given prior to the sale herein, or at all, ensuring no oversight of the Watt Transaction.

## DEFENDANTS' ACTS AND OMISSIONS CONSTITUTED BREACHES OF THEIR FIDUCIARY DUTIES TO HRI AND DUTIES TO CREDITORS.

175.    Defendants at all times herein, were obligated to act on an informed basis, in good faith and, in a manner consistent with the best interests of HRI.  Among Defendant's duties were the duty of loyalty, the duty of care, and the duty of obedience, each such duty comprising and including the duty to act in good faith.

176.    Defendants by their acts or omissions set forth above, failed to act in an informed manner and in good faith and breached their fiduciary duties to HRI, including, without limitation, the following:

(a)   Failing to make reasonable inquiries and investigation concerning and failing to recognize HRI's precarious financial position and red flags indicating the same before and during its liquidity crisis.

(b)   Failing to make reasonable inquiries and investigation concerning options and failing to direct HRI and management to take steps necessary to improve its precarious financial position.

(c)   Failing to timely and reasonably market HRI's assets before and during its liquidity crisis, until HRI was on the brink of bankruptcy.

(d)   Failing to timely employ a turnaround or industry consultant.

(e)   Failing to timely implement policies, steps, and suggestions of consultants, once retained, to improve HRI's precarious financial position.

(f)   Failing to make reasonable inquiries and investigation concerning the implications of issues relative to the covenants of the CNB Reimbursement Agreement and resolve the issues concerning the same.

(g)   Failing to make reasonable inquiries and investigation concerning the legal and financial implications of and approving the appropriation and spending of restricted donation and endowment funds for operational expenses or for matters other than which such funds were given.

(h)   Failing to make reasonable inquiries and investigation concerning and failing to timely properly present, negotiate, or effect an association with a larger research institution.

(i)   Failing to make reasonable inquiries and investigation concerning the risks of and to prevent USC and UCLA from hiring the vast majority of HRI's researchers.

(j)   Abdicating governance and oversight responsibilities to Boswell, Meyer, and each of them.

(k)   Failing to adequately supervise Boswell, Meyer, CBRE, and each of them.

(l)   Failing to make reasonable inquiries and investigation concerning and failing

1    to timely and adequately monitor the negotiation and execution of a "sell

2    strategy," resulting in a rushed and uninformed sale process of all or

3    substantially all of HRI's assets.

4    **(m)**    Failing to make reasonable inquiries and investigation concerning the

5    implications of the substantially changed terms of the sale of all or

6    substantially all of HRI's assets, and whether the sale was reasonable under

7    the circumstances before approving the sale.

8    **(n)**    Failing to make reasonable inquiries and investigation concerning the terms

9    of the rushed sale of all or substantially all of HRI's assets and whether the

10    sale was reasonable under the circumstances before approving the sale.

11    **(o)**    The approval by the Approving Trustees of all or substantially all of HRI's

12    assets on inadequate notice without further inquiry or investigation.

13    **(p)**    The approval by the Approving Trustees, on an uninformed basis, of the fire

14    sale of all, or substantially all, of HRI's assets for a fraction of their value

15    without further inquiry or investigation.

16    **(q)**    The approval by the Approving Trustees, of the rushed sale of HRI's assets

17    before filing bankruptcy, rather than through a court supervised auction

18    under 11 U.S.C. section 363 without further inquiry or investigation.

19    **(r)**    The approval by the Approving Trustees of the Watt Transaction in a rushed

20    and uninformed manner.

21    **(s)**    Failing to obtain and consider all material information prior to approval of

22    the Watt Transaction.

23    **(t)**    Failing to inquire as to what other purchasers would pay for the same assets

24    as acquired in the Watt Transaction.

25    **(u)**    Conducting a massively deficient sale process in a rushed and ineffective

26    manner that resulted in HRI receiving grossly inadequate consideration for

27    all or substantially all of its assets.

28    **(v)**    Negotiating and obtaining personal releases for the Trustees and officers

1364683.3                                        32

1  while HRI received no meaningful releases, but instead remained liable to

2  the Watt Party for $1,000,000 and was required to give full releases to the

3  Watt Party and CNB.

4  **(w)**  Failing to obtain and consider all material information concerning and to

5  adequately consider selling the property the subject of the Watt transaction

6  or additional property in a sale process in and supervised by the bankruptcy

7  court or allowing the property to be sold by a Chapter 7 or Chapter 11

8  Trustee.

9  **(x)**  Failing to sell the property the subject of the Watt Transaction or additional

10  property in a sale process in and supervised by the bankruptcy court or

11  allowing the property to be sold by a Chapter 7 or Chapter 11 Trustee.

12  **(y)**  Failing to report the intention to sell all or substantially all of HRI's assets

13  to the California Attorney General, who under California law is entrusted

14  with the duty to oversee such sales by non-profit organizations.

15  177.  These acts and omissions also constituted breaches of fiduciary or other duties owed

16  to creditors, including those arising when HRI was operating in the zone of insolvency or was

17  insolvent, including, without limitation, the duty to avoid actions that divert, dissipate, or unduly

18  risk corporate assets that might otherwise be used to pay claims of creditors.

19  178.  The acts and omissions above were in bad faith and demonstrated a faithlessness or

20  lack of true devotion to the interests of HRI.

21  179.  The acts and omissions above were reckless, wanton, intentional, or grossly

22  negligent.

23

24  **FIRST CLAIM FOR RELIEF**

25  **(Breach of Fiduciary Duty of Loyalty and Lack of Good Faith)**

26  **(Against All Defendants, and Does 1-25)**

27  180.  Plaintiff refers to and incorporates herein by reference each and every allegation

28  contained in paragraphs 1 through 179, inclusive, as though fully set forth herein.

1364683.3                                    33

1       181.   By committing the acts and omissions above, Defendants failed to act in good faith

2  and breached their fiduciary duty of loyalty.

3       182.   HRI was harmed by said acts, omissions, and breaches in an amount to be proved at

4  trial.

5

6                       **SECOND CLAIM FOR RELIEF**

7      **(Breach of Fiduciary Duty of Care and Lack of Good Faith)**

8              **(Against All Defendants, and Does 1-25)**

9       183.   Plaintiff refers to and incorporates herein by reference each and every allegation

10  contained in paragraphs 1 through 179, inclusive, as though fully set forth herein.

11       184.   By committing the acts and omissions above, Defendants, and each of them, failed

12  to act in good faith and breached their fiduciary duty of care.

13       185.   HRI was harmed by said acts, omissions, and breaches in an amount to be proved at

14  trial.

15

16                       **THIRD CLAIM FOR RELIEF**

17                   **(Corporate Waste)**

18              **(Against All Defendants and Does 1-25)**

19       186.   Plaintiff refers to and incorporates herein by reference each and every allegation

20  contained in paragraphs 1 through 179, inclusive, as though fully set forth herein.

21       187.   By committing the acts and omissions above, Defendants breached their duty not to

22  commit corporate waste, including, without limitation the duty to avoid actions that divert,

23  dissipate, or unduly risk corporate assets that might otherwise be used to pay claims of creditors.

24       188.   HRI was harmed by said acts, omissions, and breaches in an amount to be proved at

25  trial.

26

27      WHEREFORE, Plaintiff prays that judgment be entered as follows:

28

1    **ON THE FIRST, SECOND, AND THIRD CLAIMS FOR RELIEF:**

2        1.      That damages be assessed against the Defendants, and each of them according to

3    proof;

4        2.      For costs of suit incurred herein;

5        3.      For interest according to law; and

6        4.      For interest thereon from the respective date of receipt of each of the Transfers.

7        5.      For all other and further relief as the Court deems just and proper.

8

9    DATED:  November 28, 2016                DANNING, GILL, DIAMOND & KOLLITZ, LLP

10

11                                                          /s/ Walter K. Oetzell
                                                  _____
12                                                WALTER K. OETZELL
                                                  Attorneys for John J. Menchaca, Trustee for the Chapter 7
13                                                Estate of TIFKAH, fka the House Research Institute

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1900 Avenue of the Stars, 11th Floor, Los Angeles, CA 90067-4402.

A true and correct copy of the foregoing document entitled (*specify*):  FIRST AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY OF LOYALTY; BREACH OF FIDUCIARY DUTY OF CARE; AND CORPORATE WASTE  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On  November 28, 2016  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

⊠ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**: On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on  November 28, 2016 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA PERSONAL DELIVERY BY ALSSI ON NOVEMBER 29, 2016
The Honorable Robert Kwan
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street
Bin outside of Suite 1682
Los Angeles, CA 90012

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 28, 2016 | Cindy Cripe | *[signature]* |
| --- | --- | --- |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                  **F 9013-3.1.PROOF.SERVICE**

ADDITIONAL SERVICE INFORMATION (if needed):

## 1. **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

C John M Melissinos on behalf of Defendant EDWARD P. ROSKI, an individual
jmelissinos@greenbergglusker.com,
kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com
Eric D Winston on behalf of Defendant TINA CARUSO, an individual
ericwinston@quinnemanuel.com
James P Menton, JR on behalf of Defendant STEPHEN CHANDLER, an individual
JPMenton@rkmc.com
Jeffery D Hermann on behalf of Defendant DAVID H. KOCH, an individual
jhermann@orrick.com
John J Menchaca (TR) jmenchaca@menchacacpa.com,
ca87@ecfcbis.com;igaeta@menchacacpa.com
Jonathan Guy on behalf of Defendant DAVID H. KOCH, an individual jguy@orrick.com,
nymao@orrick.com;Sean.Tarantino@kochps.com;pamend@orrick.com;mperrigino@orrick.com
Richard W Brunette on behalf of Defendant WALLIS ANNENBERG, an individual
rbrunette@sheppardmullin.com, vlamonica@sheppardmullin.com
Robert J Becher on behalf of Defendant TINA CARUSO, an individual
robertbecher@quinnemanuel.com, calendar@quinnemanuel.com
Steven Gentry on behalf of Defendant CATHERINE MEYER, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant JOHN W. HOUSE, an individual sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant DERALD E. BRACKMAN, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant JAMES S. TWERDAHL, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant CHARLOTTE SCHAMADAN, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant David Z D'Argenio sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant William B Witte sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant JOAN G. FLAX, an individual sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant WILLIAM LUXFORD, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant TOMILEE TILLEY GILL, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant JOHN THOMAS, an individual sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant PETER WU, an individual sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant LAURENCE G. PREBLE, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant LYNN BOOTH, an individual sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant FOREST G. SMITH, III, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant PATRICIA MOLLER, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant ROBERT G. HAYMAN, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant JAMES D. BOSWELL, an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant MALCOLM CUTLER, JR., an individual
sgentry@bergerkahn.com
Steven Gentry on behalf of Defendant CARMEN PULIAFITO, an individual
sgentry@bergerkahn.com
United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
Walter K Oetzell on behalf of Plaintiff John J Menchaca, Chapter 7 Trustee woetzell@dgdk.com,
DanningGill@gmail.com;woetzell@ecf.inforuptcy.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**